SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## State v. Mark Dunbar (A-94-15) (077839)

**Argued April 24, 2017 -- Decided July 10, 2017**

**FERNANDEZ-VINA, J., writing for the Court.**

In this appeal, the Court considers the appropriate standard for police officers to conduct a canine sniff for the detection of narcotics.  In particular, the Court determines whether police require reasonable suspicion of a drug offense to effect a canine sniff during a motor vehicle stop.

On May 3, 2013, around 10:20 p.m., Bradley Beach Police Officer Michael Tardio observed a green Ford Focus parked in one of QuickChek's handicapped-reserved spaces.  The car's New Jersey license plate did not bear a handicapped designation, nor was there a handicapped designation placard on display in the car's interior.

Officer Tardio recognized the car as that of defendant Mark Dunbar.  On May 2, 2013, the Bradley Beach Police received information from the Manasquan Police Department that a female reported she "was getting her drugs from Mark Dunbar."  The anonymous informant also reported that Dunbar used a green Ford Focus, with a New Jersey license plate matching that of the car parked at QuickChek, to distribute narcotics.

Officer Tardio pulled into the QuickChek parking lot to initiate a motor vehicle stop, exited his patrol car, and approached the suspect vehicle.  While Officer Tardio spoke with Dunbar, Officer Major arrived on the scene as backup.  Officer Major was accompanied by a narcotics canine.  Upon Officer Major's arrival, Officer Tardio instructed Dunbar to exit the vehicle and walk toward Officer Major while he spoke with Lisa Parker.  Then, Lisa's sister, Deborah Parker, exited the QuickChek.  At that time, Officer Tardio confirmed that all three individuals arrived at the QuickChek together, connecting them to Dunbar's vehicle.

After identifying all three individuals, Officer Tardio "immediately" contacted dispatch to request a warrant search; the search returned an outstanding warrant for Deborah Parker.  Officer Tardio requested the presence of a female officer to arrest Deborah Parker.  Officer Tardio testified that it "maybe" took about two minutes for the female officer to arrive.  In the meantime, Officer Tardio spoke with Dunbar and advised him of the recent allegations that he was selling drugs.  Dunbar denied any wrongdoing.  Officer Tardio informed Dunbar that Officer Major and his narcotics canine would conduct a sniff around the vehicle's exterior.  The canine positively indicated the presence of narcotics.  The record is unclear as to whether the canine sniff took place while the officers were waiting for the arrival of the female officer from Asbury Park or after she arrived.

Officer Tardio instructed Dunbar that he could consent to a search of his vehicle or have his car impounded pending a search warrant.  Dunbar initially refused consent but changed his mind when a tow truck arrived.  Officer Tardio read Dunbar his rights.  With Dunbar's permission, the officers searched the vehicle's trunk, from which they recovered Xanax, oxycodone, and heroin.  The officers arrested Dunbar and Deborah Parker.  A Monmouth County grand jury indicted Dunbar for three counts of third-degree possession of controlled dangerous substances.

Prior to trial, Dunbar moved to suppress the drugs.  The court granted Dunbar's motion, holding that the officers did not have reasonable suspicion that Dunbar was engaged in a drug transaction in his vehicle in the QuickChek parking lot at that time and therefore could not perform a canine sniff.  Furthermore, the court held that, based on the number of officers and the threat of towing his vehicle, Dunbar did not voluntarily provide consent.

Ten days later, the State moved for reconsideration in light of the then-recent United States Supreme Court decision, Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609 (2015).  The trial court denied the motion.  The court explained, "[t]he State has not met its burden of proof that the time for tasks necessitated by [Dunbar's] traffic violation included the time of the dog sniff."  The court entered an order denying reconsideration.

Prior to trial, the Appellate Division affirmed the suppression of the drugs. Citing prior Appellate Division cases, the court posited that New Jersey's standard for canine sniffs is reasonable suspicion. The court concluded that the officers did not harbor reasonable suspicion that Dunbar or the Parker sisters were engaged in drug activity and found that the officers lacked reasonable suspicion to effectuate the canine sniff. The panel also affirmed the trial court's holding on consent.

The Court granted the State's motion for leave to appeal. 226 N.J. 543 (2016).

**HELD**: The Court adopts the federal standard barring unnecessary delays for the purpose of canine sniffs. Officers do not need reasonable suspicion of a drug offense provided that the canine sniff does not prolong the stop beyond the time required to complete the stop's mission.

1. The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution equally guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A lawful roadside stop by a police officer constitutes a seizure under both Constitutions. To justify such a seizure, a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense. During an otherwise lawful traffic stop, a police officer may inquire into matters unrelated to the justification for the traffic stop. An officer's ability to pursue incidental inquiries, however, is not without limitations. Specifically, the incidental checks may not be performed "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez, supra, 135 S. Ct. at 1615. (pp. 13-16)

2. In United States v. Place, the United States Supreme Court held that a canine sniff does not constitute a "search" within the meaning of the Fourth Amendment. 462 U.S. 696, 706-07 (1983). The Court reasoned that a canine sniff is so limited in the manner of investigation and in the noncontraband items it reveals that it is "much less intrusive than a typical search." Id. at 707. In Illinois v. Caballes, 543 U.S. 405, 408 (2005), the Court held that "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [upon the defendant's] constitutionally protected interest in privacy." In Rodriguez, supra, the Court reaffirmed its holding that, although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 135 S. Ct. at 1615. The federal standard does not require particularized reasonable suspicion to conduct a canine sniff during the course of a routine traffic stop. But if the canine sniff extends the traffic stop beyond the time reasonably required to complete the traffic stop's purpose, the sniff is unlawful absent independent reasonable suspicion of criminal activity. (pp. 16-20)

3. The Appellate Division has echoed some of the federal approach regarding canine sniffs but has departed from the federal standard by requiring reasonable and articulable suspicion to justify canine sniffs. (pp. 20-22)

4. The Court now adopts the federal standard for canine sniffs. Accordingly, an officer does not need reasonable suspicion independent from the justification for a traffic stop in order to conduct a canine sniff but may not conduct a canine sniff in a manner that prolongs a traffic stop beyond the time required to complete the stop's mission, unless he possesses reasonable and articulable suspicion to do so. In other words, in the absence of such suspicion, an officer may not add time to the stop. (pp. 23-25)

5. Applying this legal standard to Dunbar's appeal, two issues arise: whether the canine sniff prolonged Officer Tardio's traffic stop beyond the time reasonably required to address Dunbar's parking infraction, and, if so, whether this delay was justified by independent reasonable suspicion that Dunbar possessed drugs at that time. The record does not provide sufficient information. The Court expresses no opinion as to whether the canine sniff prolonged the traffic stop or whether the totality of the circumstances generated reasonable suspicion that Dunbar possessed drugs at the time of the stop, leaving those determinations to the trial court on remand. (pp. 26-27)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.**

2

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

MARK DUNBAR,

    Defendant-Respondent.

        Argued April 24, 2017 – Decided July 10, 2017

        On appeal from the Superior Court, Appellate
        Division.

        Frank Muroski, Deputy Attorney General,
        argued the cause for appellant (Christopher
        S. Porrino, Attorney General, attorney;
        Frank Muroski, of counsel and on the
        briefs).

        Stefan Van Jura, Deputy Public Defender II,
        argued the cause for respondent (Joseph E.
        Krakora, Public Defender, attorney; Stefan
        Van Jura, of counsel and on the briefs).

    JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

    In this appeal, we consider the appropriate standard for police officers to conduct a canine sniff for the detection of narcotics. In particular, we are called upon to determine whether police require reasonable suspicion of a drug offense to effect a canine sniff during a motor vehicle stop. We conclude that officers do not need such reasonable suspicion provided that the canine sniff does not prolong the stop beyond the time

required to complete the stop's mission.  We adopt the federal standard barring unnecessary delays for the purpose of canine sniffs.

The Bradley Beach Police Department knew defendant Mark Dunbar through several previous incidents and had recently received two tips that he was selling drugs.  In 2013, a police officer initiated a motor vehicle stop of Dunbar and two passengers for parking in a handicapped parking space.

Shortly thereafter, another officer arrived with a canine trained to detect the presence of narcotics.  The police instructed Dunbar to exit his vehicle.  The first officer then checked if Dunbar and his two passengers had any outstanding warrants.  Because one of the female passengers had an outstanding warrant, the police called a female officer from a nearby municipality to arrest her.

At some point, either while waiting for the female officer's arrival or shortly after her arrival, the second officer walked his canine around Dunbar's car.  The canine signaled the presence of drugs.  Faced with this information, Dunbar consented to a search of his car, which revealed narcotics.  The State charged him with drug possession.

Dunbar moved to suppress the drugs recovered from his car. The trial court granted Dunbar's suppression motion, concluding that the police did not have the requisite reasonable suspicion

2

that Dunbar was engaged in drug activity to conduct the canine sniff around Dunbar's car. The State filed a motion to reconsider based on the then-recent United States Supreme Court decision, Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), which held that officers do not need reasonable suspicion to conduct a canine sniff but that they cannot delay a traffic stop to perform such a sniff. The court denied the State's motion.

The Appellate Division affirmed, holding that police officers need reasonable suspicion independent of the justifications for a traffic stop to perform a canine sniff. Despite recognizing that the timeline was unclear, the appellate panel also held that the canine sniff did not unreasonably prolong the traffic stop.

For the reasons set forth in this opinion, we reverse the grant of Dunbar's motion to suppress and remand for further factfinding. Specifically, we direct the trial court to assess whether the canine sniff prolonged the traffic stop and, if so, whether independent reasonable suspicion supported that delay.

I.

A.

The following facts derive from the undisputed testimony at defendant's motion to suppress hearing. On May 3, 2013, around 10:20 p.m., Bradley Beach Police Officer Michael Tardio was on

patrol in a marked police vehicle.  As he drove past a QuickChek convenience store, he observed a green Ford Focus parked in one of QuickChek's handicapped-reserved spaces.  The car's New Jersey license plate did not bear a handicapped designation, nor was there a handicapped designation placard on display in the car's interior.

Officer Tardio recognized the car as that of defendant Mark Dunbar.  Officer Tardio had personal knowledge of Dunbar through Dunbar's "many" prior interactions with law enforcement.  In 2012, the Bradley Beach Police had arrested Dunbar for a narcotics offense.  One week prior to the QuickChek traffic stop, Officer Tardio had received information from two sources -- one identified informant and one anonymous informant -- about Dunbar's alleged drug distribution activities in the area.

On April 28, 2013, five days prior to the traffic stop, Officer Tardio responded to Dunbar's complaints about harassing text messages he received from his friend's husband.  Officer Tardio met with Dunbar at his apartment, where Dunbar showed him a text message threatening to harm him if he continued to sell narcotics to the sender's wife.  Officer Tardio contacted the sender, who acknowledged sending the message and explained that his wife was a recovering drug addict to whom Dunbar had recently sold pills.

Then, on May 2, 2013, one day before the traffic stop, the

4

Bradley Beach Police received information about Dunbar from the Manasquan Police Department. Specifically, the Manasquan Police relayed that a female, who "wanted to remain anonymous," reported she "was getting her drugs from Mark Dunbar," and disclosed his home address. The anonymous informant also reported that Dunbar used a green Ford Focus, with a New Jersey license plate matching that of the car parked at QuickChek, to distribute narcotics.

Returning to May 3, 2013, the evening in question, Officer Tardio pulled into the QuickChek parking lot to initiate a motor vehicle stop, activating his emergency lights and pulling behind Dunbar's car. Office Tardio exited his patrol car and approached the suspect vehicle. He observed Dunbar in the driver's seat, as well as Lisa Parker, whom the officer also recognized from "[m]any prior dealings," in the rear passenger seat. Dunbar admitted to the officer that he parked in a handicapped space without possessing the appropriate license plate or placard because one of his passengers "had a bad back."

While Officer Tardio spoke with Dunbar, Bradley Beach Police Officer Major arrived on the scene as backup. Officer Major was accompanied by a narcotics canine. Upon Officer Major's arrival, Officer Tardio instructed Dunbar to exit the vehicle and walk toward Officer Major while he spoke with Lisa Parker. Then, Lisa's sister, Deborah Parker, whom Officer

5

Tardio also knew through prior encounters, exited the QuickChek. At that time, Officer Tardio confirmed that all three individuals arrived at the QuickChek together, connecting them to Dunbar's vehicle.

After identifying all three individuals, Officer Tardio "immediately" contacted dispatch to request a warrant search; the search returned an outstanding warrant for Deborah Parker. Officer Tardio requested the presence of a female officer to arrest Deborah Parker. He testified that it is standard procedure to have a female officer search and arrest female suspects. Dispatch sent a nearby female officer from the Asbury Park Police Department because the Bradley Beach Police did not have a female officer on duty.

Officer Tardio testified that it "maybe" took about two minutes for the female officer to arrive from Asbury Park. In the meantime, Officer Tardio spoke with Dunbar and advised him of the recent allegations that he was selling drugs. Dunbar denied any wrongdoing. At this point, Officer Tardio informed Dunbar that Officer Major and his narcotics canine would conduct a sniff around the vehicle's exterior. After Officer Major walked the canine around the vehicle, the canine positively indicated the presence of narcotics.

The record is unclear as to whether the canine sniff took place while the officers were waiting for the arrival of the

6

female officer from Asbury Park or after she arrived. Officer Tardio's testimony did not specify the time of the canine sniff or whether the canine sniff substantially delayed the traffic stop. Before this Court, the State asserted that the canine sniff and the arrival of the female officer occurred "almost simultaneously," but did not offer an exact order of the events. The precise chronology of the canine sniff, specifically when the canine walked around Dunbar's vehicle and whether the sniff prolonged the purpose of the traffic stop, remains uncertain.

Given the positive canine sniff, Officer Tardio instructed Dunbar that he could consent to a search of his vehicle or have his car impounded pending a search warrant. Dunbar initially refused consent but changed his mind when a tow truck arrived about ten minutes later. Officer Tardio read Dunbar his rights, including the right to refuse consent, the right to revoke consent, and the right to be present during the search. With Dunbar's permission, the officers searched the vehicle's trunk, from which they recovered Xanax, oxycodone, and heroin. The officers arrested Dunbar and Deborah Parker.

B.

At the time of his arrest, Dunbar was charged with parking in a handicapped parking space, contrary to N.J.S.A. 39:4-138(o), and possession of controlled dangerous substances (CDSs) by a motor vehicle operator, contrary to N.J.S.A. 39:4-49.1.

7

Subsequently, a Monmouth County grand jury indicted Dunbar for three counts of third-degree possession of CDSs, contrary to N.J.S.A. 2C:35-10(a)(1).

Prior to trial, Dunbar moved to suppress the drugs seized from the trunk of his vehicle. The parties argued the motion in January 2015. The State presented Officer Tardio as its sole witness; Dunbar neither testified nor presented any witnesses. Defense counsel asserted that the canine sniff was not supported by reasonable suspicion and that Dunbar's consent was coerced. The State averred that the officers had reasonable suspicion that Dunbar was engaged in narcotics sales and that his consent was voluntary.

At the close of arguments from each party, the court rendered an oral decision granting Dunbar's suppression motion. The court found Officer Tardio to be a credible witness who had acted appropriately in stopping Dunbar and investigating the individuals for warrants. The court also concluded that Officer Tardio acted diligently in questioning Dunbar about the narcotics allegations.

The court held, however, that the officers did not have reasonable suspicion that Dunbar was engaged in a drug transaction in his vehicle in the QuickChek parking lot at that time and therefore could not perform a canine sniff. Furthermore, the court held that, based on the number of

officers and the threat of towing his vehicle, Dunbar did not voluntarily provide consent. Accordingly, the court suppressed the evidence recovered from Dunbar's trunk.

Ten days later, the State moved for reconsideration in light of the then-recent United States Supreme Court decision, Rodriguez, supra, 575 U.S. at ___, 135 S. Ct. at 1609, 191 L. Ed. 2d at 492. The trial court denied the motion. The court explained,

> [t]he State did not establish the time necessary to handle the matter of [Dunbar's] parking violation. Accordingly, the State did not establish that, during the time necessary to handle the matter of [Dunbar's] parking violation, the police performed the dog sniff. The State has not met its burden of proof that the time for tasks necessitated by [Dunbar's] traffic violation included the time of the dog sniff. Police did not have probable cause to believe that, at the time and place before the dog sniff, [Dunbar] possessed CDSs.

Consequently, the court entered an order denying reconsideration.

Prior to trial, the Appellate Division granted the State leave to appeal. In an unpublished, per curiam opinion, the Appellate Division affirmed the suppression of the drugs seized from Dunbar's trunk.

The appellate panel accepted that Officer Tardio appropriately stopped Dunbar to issue him a ticket for parking in a handicapped parking space, justifiably ordered Dunbar out

9

of his vehicle during the course of the traffic stop, and properly detained Dunbar and his passengers to conduct a warrant check. Nonetheless, the panel concurred with the trial judge's initial determination that "the officers lacked a reasonable suspicion that [Dunbar] possessed drugs or was involved in narcotics activity at the time and place of the stop."

Citing prior Appellate Division cases, the court posited that New Jersey's standard for canine sniffs is reasonable suspicion. The appellate panel stated that officers may conduct a canine sniff even if it prolongs a traffic stop, provided that the officers have reasonable suspicion of drug possession. Applying that standard to the canine sniff of Dunbar's vehicle, the court concluded that the officers did not harbor reasonable suspicion that Dunbar or the Parker sisters were engaged in drug activity. Accordingly, the panel found that the officers lacked reasonable suspicion to effectuate the canine sniff. The panel also affirmed the trial court's holding on consent because, without the canine sniff, there was insufficient reasonable suspicion to seek Dunbar's consent to search.

Although not central to its holding, the Appellate Division briefly discussed the potential delay caused by the canine sniff. The panel disagreed with the trial court's findings to the extent that the court found the canine sniff to cause an unreasonable delay of the traffic stop. In a footnote, however,

10

the appellate court conceded that "the exact timing of events is unclear from the record."

We granted the State's motion for leave to appeal. 226 N.J. 543 (2016).

## II.

### A.

The State urges this Court to reverse the judgment of the Appellate Division and align our standard with the federal approach to canine sniffs. The State argues that Fourth Amendment jurisprudence supports the "compelling and unambiguous" conclusion that a police officer does not need reasonable suspicion to subject a lawfully stopped vehicle to a canine sniff for drug detection purposes.

Relying upon United States Supreme Court caselaw, the State avers that canine sniffs do not require reasonable suspicion because they are far less intrusive than a search and are therefore regarded as sui generis. According to the State, Dunbar presents no justification for deviating from well-established Fourth Amendment precedent regarding canine sniffs. The State further contends that requiring reasonable suspicion to conduct canine sniffs would grant criminals a windfall "while affording no legitimate privacy protections to the law-abiding public." The State stresses that canine sniffs are necessary not only for narcotics investigations, but also for catching

11

terrorists and child abductors. The State maintains that the narcotics-trained canines at issue are reliable.

Next, the State asserts that the Appellate Division misconstrued prior New Jersey caselaw in concluding that police need reasonable suspicion to effect a canine sniff. The State claims that any Appellate Division holdings to the contrary were "mistakenly [written] in dicta" and run counter to the approaches of the overwhelming majority of other states.

In the alternative, the State argues that Officer Tardio articulated a reasonable suspicion that Dunbar's vehicle contained evidence of narcotics trafficking. The State cites to the following factors that informed Tardio's suspicions: Dunbar's run-ins with the police, including his previous drug arrest; the two recent tips that Dunbar was selling drugs, including one that referenced Dunbar's car; and the presence of a person in Dunbar's car with an outstanding warrant. According to the State, the totality of those circumstances established reasonable suspicion to conduct the canine sniff.

### B.

Dunbar argues that, under Article I, Paragraph 7 of the New Jersey Constitution, reasonable suspicion -- separate from the suspicion necessary for a motor vehicle stop -- is required before police may subject a lawfully stopped vehicle to a canine sniff. Conceding that the Appellate Division's jurisprudence

12

has been inconsistent as to the proper canine-sniff standard, Dunbar urges this Court to break definitively from the federal approach.

Dunbar emphasizes New Jersey's "rich history of affording our citizens greater protections than the federal constitution" and asserts that requiring reasonable suspicion to conduct canine sniffs is consistent with that tradition. Dunbar avers that the federal standard permits unbridled and indiscriminate canine sniffs, which intrude upon citizens' constitutionally guaranteed rights. Dunbar further maintains that narcotics canines are unreliable and frequently alert to false positives, subjecting law-abiding citizens to unwarranted intrusions.

In the alternative, Dunbar contends that, even if Officer Tardio possessed a reasonable suspicion that Dunbar was selling drugs out of his vehicle, the State failed to bear its additional burden of showing that the canine sniff did not unreasonably prolong the otherwise lawful traffic stop.

### III.

#### A.

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution equally guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; N.J. Const. art.

13

I, ¶ 7.

A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions. Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 788, 172 L. Ed. 2d 694, 704 (2009); State v. Scriven, 226 N.J. 20, 33 (2016). In order to justify such a seizure, "a police officer must have a reasonable and articulable suspicion that the driver of a vehicle, or its occupants, is committing a motor-vehicle violation or a criminal or disorderly persons offense." Scriven, supra, 226 N.J. at 33-34.

During an otherwise lawful traffic stop, a police officer may inquire "into matters unrelated to the justification for the traffic stop." Johnson, supra, 555 U.S. at 333, 129 S. Ct. at 788, 172 L. Ed. 2d at 704; see also State v. Dickey, 152 N.J. 468, 479 (1998) ("[T]he reasonableness of [a] detention is not limited to investigating the circumstances of the traffic stop.").

For instance, a police officer may make "ordinary inquiries incident to [the traffic] stop," Rodriguez, supra, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499 (alteration in original) (quoting Illinois v. Caballes, 543 U.S. 405, 408, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842, 847 (2005)), such as "checking the driver's license," verifying whether the driver has any outstanding warrants, "and inspecting the automobile's

14

registration and proof of insurance," ibid. And if, as a result of the initial stop or further inquiries, "the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Dickey, supra, 152 N.J. at 479-80 (alteration in original) (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir.), cert. denied, 516 U.S. 936, 116 S. Ct. 348, 133 L. Ed. 2d 245 (1995)).

An officer's ability to pursue incidental inquiries, however, is not without limitations. A lawful traffic stop can transform into an unlawful detention "if its manner of execution unreasonably infringes" on constitutionally protected interests. Caballes, supra, 543 U.S. at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846. Specifically, the incidental checks performed by a police officer may not be performed "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez, supra, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499; see also Dickey, supra, 152 N.J. at 476-79 (noting that detention can become unlawful if longer than needed to diligently investigate suspicions).

Accordingly, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required

15

to complete that mission." Caballes, supra, 543 U.S. at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846; see also State v. Coles, 218 N.J. 322, 344 (2014) ("[T]he detention must be reasonable both at its inception and throughout its entire execution.").

Having reviewed the overarching constitutional principles at issue in this appeal, we now turn to the relevant jurisprudence concerning canine sniffs.

B.

The United States Supreme Court has addressed the constitutionality of canine sniffs on several occasions. In United States v. Place, the Court considered a canine sniff performed at an airport to inspect the defendant's luggage. 462 U.S. 696, 698-700, 103 S. Ct. 2637, 2639-41, 77 L. Ed. 2d 110, 115-16 (1983). The Court held that a canine sniff does not constitute a "search" within the meaning of the Fourth Amendment. Id. at 706-07, 103 S. Ct. at 2644-45, 77 L. Ed. 2d at 120-21. In reaching that conclusion, the Court reasoned that a canine sniff is so limited in the manner of investigation and in the noncontraband items it reveals that it is "much less intrusive than a typical search." Id. at 707, 103 S. Ct. at 2644, 77 L. Ed. 2d at 121. The Court thus characterized canine sniffs as sui generis. Id. at 707, 103 S. Ct. at 2644-45, 77 L. Ed. 2d at 121.

16

The Court has since reaffirmed its conclusion that a canine sniff does not present a search subject to the Fourth Amendment. In City of Indianapolis v. Edmond, the Court held that officers walking a drug-sniffing canine around a vehicle stopped at a checkpoint did not transform an otherwise lawful seizure into a search. 531 U.S. 32, 40, 121 S. Ct. 447, 453, 148 L. Ed. 2d 333, 342-43 (2000).

The Supreme Court clarified its approach to canine sniffs conducted during routine traffic stops in two cases. In Caballes, supra, a trooper pulled the defendant over for speeding. 543 U.S. at 406, 125 S. Ct. at 836, 160 L. Ed. 2d at 845-46. As the trooper wrote the defendant a warning ticket, a second trooper arrived with a canine trained to detect narcotics, which he walked around the defendant's vehicle. Ibid. The canine detected the presence of drugs, leading to a search that uncovered marijuana. Id. at 406, 125 S. Ct. at 836, 160 L. Ed. 2d at 846. The entire affair took approximately ten minutes. Ibid. The Illinois Supreme Court held that the canine sniff was unconstitutional because the troopers did not have reasonable suspicion that the defendant possessed narcotics. Id. at 408, 125 S. Ct. at 837, 160 L. Ed. 2d at 846.

The United States Supreme Court reversed, holding that "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a

17

reasonable manner, unless the dog sniff itself infringed [upon the defendant's] constitutionally protected interest in privacy." Id. at 408, 125 S. Ct. at 837, 160 L. Ed. 2d at 847. The Court concluded that the canine sniff, which took place outside of the defendant's vehicle while the troopers were in the process of carrying out the traffic violation, did not infringe upon the defendant's privacy interests. Id. at 408-10, 125 S. Ct. at 837-38, 160 L. Ed. 2d at 847-48. In sum, the troopers did not need reasonable suspicion that the defendant was engaged in narcotics trafficking to conduct the canine sniff.

Elaborating on its holding in Caballes, the Supreme Court later addressed whether police can extend an otherwise completed traffic stop in order to conduct a canine sniff, absent independent reasonable suspicion. In Rodriguez, supra, a canine officer pulled the defendant over for a traffic violation. 575 U.S. at ___, 135 S. Ct. at 1612, 191 L. Ed. 2d at 496. After completing a records check on the defendant and his passenger, the officer issued a written warning. Id. at ___, 135 S. Ct. at 1613, 191 L. Ed. 2d at 497. At that point, with the justification for the traffic stop "out of the way," the officer performed a canine sniff around the defendant's vehicle, resulting in a positive indication of narcotics. Ibid. A subsequent search uncovered methamphetamine. Ibid.

18

The Court reaffirmed its holding that, although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499. The Court explained that a canine sniff is a check unrelated to the mission of a traffic stop. Ibid. Applying that analysis to the facts of Rodriguez, the Court stated:

> If an officer can complete traffic-based inquiries expeditiously, then that is the amount of "time reasonably required to complete [the stop's] mission." As we said in Caballes and reiterate today, a traffic stop "prolonged beyond" that point is "unlawful." The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff "prolongs" -- i.e., adds time to -- "the stop."
>
> [Id. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500-01 (alteration in original) (citations omitted).]

Therefore, the Court remanded for the lower court to determine whether independent reasonable suspicion justified detaining the defendant "beyond completion of the traffic infraction." Id. at ___, 135 S. Ct. at 1616-17, 191 L. Ed. 2d at 501.

To summarize, the federal standard does not require particularized reasonable suspicion to conduct a canine sniff

19

during the course of a routine traffic stop.  But if the canine sniff extends the traffic stop beyond the time reasonably required to complete the traffic stop's purpose, the sniff is unlawful absent independent reasonable suspicion of criminal activity.  See Brent E. Newton, The Real-World Fourth Amendment, 43 Hastings Const. L.Q. 759, 793 (2016) (describing federal standard).

C.

This Court has yet to address New Jersey's standard for conducting a canine sniff.  The Appellate Division has reached the issue several times, yielding inconsistent results.

In State v. Cancel, the Appellate Division addressed a canine sniff performed on the defendant's luggage in an airport. 256 N.J. Super. 430, 433 (App. Div. 1992), certif. denied, 134 N.J. 484 (1993).  The Appellate Division upheld the use of the canine sniff.  Id. at 435-37.  Quoting extensively from Place, the appellate court explained that canine sniffs are sui generis and do not constitute searches under the Federal or our State Constitutions.  Id. at 436-37.  The opinion noted, however, that "[h]ad [the defendant] been detained without reasonable suspicion until a narcotics-sniffing canine was brought to the scene an argument could have been made that the detention was unlawful and the evidence later uncovered should be suppressed." Id. at 435.

20

In a case decided in 2006, the Appellate Division appeared to depart from the federal approach to canine sniffs. In State v. Elders, one of the issues the appellate court considered was whether an officer's threat to call a narcotics canine to a traffic stop was coercive. 386 N.J. Super. 208, 228-29 (App. Div. 2006), aff'd in part, rev'd in part, 192 N.J. 224 (2007). The Appellate Division cited Cancel as support for the position that "[t]he test of a justifiable use of a drug-sniffing dog is reasonable suspicion -- the same test applicable to justify a request for consent to search." Id. at 228. Thus, the court announced that reasonable suspicion is required before police may conduct a canine sniff during a lawful traffic stop. The appellate court held that the officer in Elders possessed the reasonable suspicion required to conduct the canine sniff. Id. at 229-30. We did not reach that issue on appeal.

The reasonable suspicion analysis in Elders informed the next Appellate Division case on the issue, State v. Baum, 393 N.J. Super. 275 (App. Div. 2007), aff'd as modified, 199 N.J. 407 (2009). In Baum, the court again addressed whether a threat to call a narcotics canine during a traffic stop constitutes coercive action. Id. at 284. In holding that the canine sniff was not coercive, the appellate court perpetuated the perception that officers need reasonable and articulable suspicion of drug possession to conduct a canine sniff. Id. at 290 (citing

21

Elders, supra, 386 N.J. Super. at 229). The panel concluded that reasonable suspicion was present based on the facts in Baum. Ibid. Again, we did not reach the issue of the canine sniff standard in the subsequent appeal.

Thus, the Appellate Division has echoed some of the federal approach regarding canine sniffs but has departed from the federal standard by requiring reasonable and articulable suspicion to justify canine sniffs.

IV.

When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts "must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015). We will set aside a trial court's findings of fact only when such findings "are clearly mistaken." Ibid. We accord no deference, however, to a trial court's interpretation of law, which we review de novo. State v. Hathaway, 222 N.J. 453, 467 (2015); State v. Hinton, 216 N.J. 211, 228 (2013).

A.

The central issue raised in this appeal is the proper basis for a canine sniff during a lawful traffic stop. Because this presents an issue of law, we accord no deference to the trial

22

court's interpretation. Hinton, supra, 216 N.J. at 228. We hereby adopt the federal standard for canine sniffs.

First, we endorse the federal determination that a canine sniff is sui generis and does not transform an otherwise lawful seizure into a search that triggers constitutional protections. Place, supra, 462 U.S. at 706-07, 103 S. Ct. at 2644-45, 77 L. Ed. 2d at 120-21; Edmond, supra, 531 U.S. at 40, 121 S. Ct. at 453, 148 L. Ed. 2d at 342-43. Canine sniffs do not involve the unveiling of noncontraband items that would otherwise remain unexposed to public view and signal only the presence or absence of illegal items. Place, supra, 462 U.S. at 707, 103 S. Ct. at 2644, 77 L. Ed. 2d at 121. Canine sniffs therefore constitute a unique procedure that is less intrusive than a search.

Accordingly, we agree with the Appellate Division's conclusion in Cancel that a canine sniff performed during a lawful detention does not constitute a search under the Fourth Amendment to the United States Constitution or Article I, Paragraph 7 of the New Jersey Constitution.

Second, we hereby adopt the federal standard for determining the manner in which an officer may conduct a canine sniff during an otherwise lawful traffic stop. To the extent that Elders and Baum can be read to suggest a different standard, we disapprove of that reading.

23

The federal standard, which focuses upon whether the canine sniff unreasonably prolongs a traffic stop beyond its lawful purpose, is a functional approach consistent with our caselaw. It is undisputed that a police officer may investigate circumstances outside the scope of the justification for a lawful traffic stop. Dickey, supra, 152 N.J. at 479-80. It is similarly unchallenged that the stop can evolve into an unlawful detention if its scope expands too far or the stop is unnecessarily prolonged. See ibid. (requiring reasonable suspicion unrelated to traffic offense to broaden inquiry); see also Coles, supra, 218 N.J. at 344 (requiring detention to be reasonably based throughout its duration). Thus, a lawful traffic stop may turn unconstitutional if the officer overly broadens the scope or prolongs the stop, absent independent reasonable suspicion.

In light of our determination that a canine sniff does not constitute a search and our reaffirmation that an unreasonably prolonged traffic stop is an unlawful seizure, the federal standard best conforms to our jurisprudence.

Accordingly, we hold today that an officer does not need reasonable suspicion independent from the justification for a traffic stop in order to conduct a canine sniff. See Caballes, supra, 543 U.S. at 408, 125 S. Ct. at 837, 160 L. Ed. 2d at 847. At the same time, we emphasize the United States Supreme Court's

24

admonition that an officer may not conduct a canine sniff in a manner that prolongs a traffic stop beyond the time required to complete the stop's mission, unless he possesses reasonable and articulable suspicion to do so. Rodriguez, supra, 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500-01. In other words, in the absence of such suspicion, an officer may not add time to the stop. Ibid. Thus, if an officer has articulable reasonable suspicion independent from the reason for the traffic stop that a suspect possesses narcotics, the officer may continue a detention to administer a canine sniff. Id. at ___, 135 S. Ct. at 1616-17, 191 L. Ed. 2d at 501.

B.

Applying this legal standard to Dunbar's appeal, two issues arise: whether the canine sniff prolonged Officer Tardio's traffic stop beyond the time reasonably required to address Dunbar's parking infraction, and, if so, whether this delay was justified by independent reasonable suspicion that Dunbar possessed drugs at that time.

The record before this Court does not provide sufficient information to determine whether the canine sniff prolonged Officer Tardio's traffic stop. The trial court did not make explicit findings as to the chronology of the canine sniff, and the Appellate Division acknowledged that the record provided incomplete information about the timeline of events. Moreover,

25

the Appellate Division premised its holding upon the reasonable suspicion standard that we reject today.

Consequently, we reverse the judgment of the Appellate Division and remand for additional proceedings. Specifically, the trial court should focus its factfinding on the "critical question" of whether the canine sniff prolonged the traffic stop and, if so, whether independent reasonable suspicion justified that delay. Id. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 501. We express no opinion as to whether the canine sniff prolonged the traffic stop or whether the totality of the circumstances generated reasonable suspicion that Dunbar possessed drugs at the time of the stop. We leave those determinations to the trial court on remand.

## V.

The judgment of the Appellate Division is reversed and the matter is remanded for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.

26